# Illinois Official Reports

## Appellate Court

*In re Henry P.*, 2014 IL App (1st) 130241

| | |
|---|---|
| Appellate Court Caption | *In re* HENRY P., a Minor (The People of the State of Illinois, Plaintiff-Appellee, v. Henry P., a Minor, Defendant-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0241 |
| Filed | May 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's commitment to the Department of Juvenile Justice arising from her original adjudication as delinquent for robbery, armed robbery, aggravated robbery, theft from person, battery, and aggravated battery and her subsequent violations of her mandatory minimum term of five years' probation, defendant's failure to timely appeal her original conviction and probation sentence deprived the appellate court of jurisdiction to consider her original conviction and probation sentence, but as to the State's second petition for supplemental relief based on defendant's probation violations, the cause was remanded for resentencing, since the trial court failed to make the mandatory finding that the commitment of defendant to the Department of Juvenile Justice was the least-restrictive alternative as required by the Juvenile Court Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-JD-00015; the Hon. Lori M. Wolfson, Judge, presiding. |
| Judgment | Remanded with instructions. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Megan E. Ledbetter, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Henry P., is a 17-year-old transgender male who now identifies herself as a female named "Carey."[1] Following a bench trial in juvenile court, defendant was adjudicated delinquent for robbery, armed robbery, aggravated robbery, theft from person, battery, and aggravated battery, and the trial court sentenced defendant to the mandatory minimum term of five years' probation, which required defendant to reside at Lawrence Hall Youth Services (Lawrence Hall), a residential facility where defendant had been placed by the Department of Children and Family Services (DCFS). Defendant later pled guilty to violating her probation by becoming absent without leave (AWOL) when she left Lawrence Hall without permission on four occasions in July 2012, and the trial court sentenced her to eight days in jail, for which she received credit. Defendant subsequently pled guilty to violating her probation a second time in November 2012 when she went AWOL twice and failed to charge her electronic monitoring bracelet on six different occasions. Prior to sentencing, the State alleged that defendant violated her probation a third time by going AWOL on several additional occasions. The trial court never arraigned defendant for her third probation violation, and it instead revoked defendant's probation and committed her to the Department of Juvenile Justice (DJJ) for her second probation violation.

¶ 2    On this appeal, defendant first raises a constitutional claim, arguing that the minimum mandatory sentence of five years' probation violates the equal protection clause of the United States and Illinois Constitutions, and as a result, we should vacate defendant's order of commitment to the DJJ, as well as her original five-year probation sentence, and remand this case for resentencing. Defendant next directly appeals her commitment to the DJJ, arguing that the trial court erred as a matter of law, or alternatively abused its discretion, when it revoked her probation and committed her to the DJJ without considering a less-restrictive alternative to a secure confinement sentence as required by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-750(1)(b) (West 2012)). Finally, defendant argues that

---

[1]In this appeal, we will refer to defendant by her identified gender.

her convictions of aggravated robbery, robbery, theft from person, and battery should be vacated since those surplus convictions violate the one-act, one-crime doctrine. For the following reasons, we remand for resentencing.

¶ 3                                    BACKGROUND

¶ 4        There are two different incidents that resulted in criminal charges against defendant: the first incident allegedly took place on October 8, 2011, and the second incident allegedly took place the following day, on October 9, 2011. Defendant was charged with attempted robbery resulting from the October 9, 2011, incident and later pled guilty. While defendant awaited sentencing in that case, she was charged in the instant case with robbery, armed robbery, aggravated robbery, theft from person, battery, and aggravated battery resulting from the October 8, 2011, incident. At her arraignment in the instant case, the trial court made findings of probable cause and urgent and immediate necessity and ordered defendant held in custody until trial.

¶ 5                             I. Defendant's Prior Conviction

¶ 6        Prior to sentencing for defendant's October 9, 2011, attempted robbery conviction, defendant's probation officer, Andrea Korte, executed a presentence investigation report (PSI) on December 30, 2011. Korte stated in the PSI that defendant was born as "Henry" on June 5, 1996. DCFS had its first contact with defendant after she was treated at Providence Hospital for burns on her thighs at the age of three, and defendant's mother was later convicted of assault in relation to that incident. Defendant was temporarily placed in the custody of a relative and later returned to her mother. At the age of four, defendant was sexually assaulted in her mother's house by an older male cousin, who was subsequently convicted and sentenced to prison for that offense.

¶ 7        Korte stated that, on June 21, 2001, when defendant was five years old, a public aid worker notified DCFS that defendant's mother brought defendant to a public aid office in a neglected state. During the visit, defendant's mother admitted to tying defendant's hands with a belt, and defendant stated that her mother tied her hands with a rope and hit her legs with a belt. The PSI indicates that defendant's mother was "indicated" for environment neglect, tying, and closing confinement, and DCFS intended to place defendant in the custody of the same relative that cared for her previously but was unable to do so when a background check revealed that the relative was married to a sex offender. On June 28, 2001, DCFS took protective custody of defendant and became her legal guardian the following year. From June 2001, until December 30, 2011, defendant was placed in different living environments 22 times, including 12 hospitalizations, many for psychiatric care. Defendant was last hospitalized for self-harm in May 2011.

¶ 8        The PSI noted that defendant first began to identify as a female in early 2011 at the age of 15, and she began to wear a wig and makeup and augment her chest with breast inserts. Defendant told Korte that she has taken hormone pills in the past and that she intends to have gender reassignment surgery in the future. Defendant currently identifies herself by the name "Carey." Although defendant's mother is supportive of defendant's male-to-female transition, her father is not, which has hurt defendant's feelings and further strained their relationship. The male cousin who previously assaulted defendant is due to be paroled, and his imminent release distresses defendant and gives her frequent nightmares. Defendant told

her parole officer that she "became Carey" in order to protect herself from her cousin. Defendant also stated that she suffers from depression episodes, during which she frequently goes "AWOL" so that she can return to her unit and "start over." Defendant has been diagnosed with major depressive disorder and posttraumatic stress disorder, in addition to a stuttering problem and significant allergies. Defendant regularly met with her social worker, maintained a good relationship with her teachers, and received speech therapy for her stuttering problem, and she takes medication for her depression.

¶ 9   The PSI indicated that DCFS placed defendant in Lawrence Hall in August 2010, and she was transferred from the Graves Unit at Lawrence Hall to the Ewen Unit in November 2010 "to more adequately support/address [her] gender identification issues," but she transferred back to the Graves Unit because she had difficulties with staff members. Defendant's adjustment to Lawrence Hall was "mixed," but in early 2011, she demonstrated "considerable progress" in addressing her issues and managing her behavior. Defendant struggled to follow staff directives and went AWOL five times in December 2011. Defendant has several friends at Lawrence Hall, many of whom are transgender or gay. Defendant developed a "strong support network with various staff" at Lawrence Hall. Defendant recently began a relationship with a boyfriend who has aggression issues and is possibly involved in street gangs. Defendant denies that she is involved in street gangs or uses drugs or alcohol, and there is no evidence to suggest the contrary.

¶ 10   Korte stated that defendant also enrolled at Lawrence Hall Therapeutic Day School, which is located on the same premises as Lawrence Hall, and although she is supposed to be in tenth grade, she has not earned enough credits to advance past ninth grade. Defendant is failing all of her classes, partially because she is consistently an hour late to school due to the fact that it takes her two hours to dress as a female in the morning. Currently, defendant's biggest issues are going AWOL and attending school on time. Korte noted that, "[f]or some time, [DCFS's] plan [had] been to transition [defendant] to a less restrictive environment," specifically, a group home followed by transitional living. Defendant was scheduled to "stepdown to a group home setting at the end of December of 2011," but that was delayed until January 31, 2012.

¶ 11   Korte noted that the parties reached an agreement of one year of probation for the October 9, 2011, offense, in which defendant allegedly threw a pumpkin at a pedestrian and attempted to steal his cellular telephone. Defendant told Korte that she was present during the attempted robbery, but she denied participating in the offense. Defendant indicated that she understands right from wrong and the consequences of her actions, but Korte noted that she still struggles with impulsive behavior, such as going AWOL, which was not an issue when she was placed on home confinement. Korte agreed with the parties' arrangement and further recommended that defendant be placed on electronic monitoring for 30 days to emphasize the need for her to refrain from going AWOL.

¶ 12   On January 26, 2012, the trial court made best interest and wardship findings and accepted the parties' agreement that defendant be placed on probation for one year for the October 9, 2011, armed robbery. The trial court also ordered defendant to: (1) complete 30 hours of community service; (2) attend a community impact panel; (3) arrive at school on time everyday; and (4) not involve herself with gangs, guns, or drugs. The trial court then released defendant to Lawrence Hall on an electronic monitoring bracelet pending her trial on the charges in the instant case. After sentencing, the trial court advised defendant that, if she left Lawrence Hall without permission or did not charge her bracelet, then she would be

returned to custody until her trial. Defendant later received a positive report of compliance and the trial court granted defendant's motion to vacate the electronic monitoring order. The trial court again advised defendant that, if she were to disobey Lawrence Hall's rules and curfew, then she would be returned to custody until her trial.

¶ 13                                   II. Suppression Hearing

¶ 14        Prior to her trial in the instant case, defendant filed a motion to suppress the victim's identification. At the suppression hearing on March 21, 2012, Detective Jennifer Fowler, the defense's only witness, testified that she was assigned to investigate the October 8, 2011, assault and robbery of Stephen Heasley. Fowler learned that Heasley previously described two of the assailants as black "trans" males, and that defendant and Shaundell H. (also known as "Ashley") were suspects. Fowler composed a six-person photographic lineup that included defendant, Ashley, and four other male nonsuspects and invited Heasley to the police station on October 21, 2011, to review the photo array and identify his attackers. Fowler acknowledged that, although defendant and Ashley appeared to be wearing women's blouses in their photographs, they were not necessarily the only two suspects in the photo array that appeared to be transgender. Heasley studied the photo array for 20 minutes and used napkins to cover each person's hair and clothing, one at a time. Heasley ultimately identified defendant and Ashley as the assailants.

¶ 15        The photo array was entered into evidence at the suppression hearing, and a photocopy appears in the appellate record. Each of the suspects in the photo array has long hair, but four of the suspects have dreadlocks, while defendant and Ashley appear to be wearing wigs. Also, defendant and Ashley are the only two suspects in the photo array that appear to be wearing women's blouses.

¶ 16        The trial court denied defendant's motion to suppress, and the case proceeded to trial that same day.

¶ 17                                         III. Trial

¶ 18        At trial, the parties stipulated that, if called as a witness, Detective Fowler would testify consistent with her testimony at the suppression hearing.

¶ 19        Stephen Heasley testified that, at 4 a.m. on October 8, 2011, he was walking west on Belmont Avenue toward the L station when he was approached by a group of four males. Heasley described two of the males as "dressed in female clothing," one of whom was defendant, and Heasley identified defendant in court. Defendant and the other male in female clothing blocked Heasley's path and demanded his cellular telephone. Heasley did not react at first, so defendant sprayed Heasley in the face with pepper spray and hit Heasley on his neck, head, and side of his body. Although the pepper spray hurt Heasley's eyes, it did not affect his eyesight. Defendant again demanded Heasley's cellular telephone, using profanity, but Heasley crouched down and held onto his phone. The others in the group joined defendant in beating Heasley and they ultimately recovered two cellular telephones from Heasley before fleeing. The attack left Heasley "in shock and traumatized," and he cried "a lot" when the police arrived shortly thereafter.

¶ 20        Heasley went to the police station on October 21, 2011, and viewed two six-person photo arrays. Only one of the photo arrays contained photographs of defendant and Ashley. Heasley reviewed the photo arrays for 20 to 30 minutes, during which time he placed four

napkins over the individual photographs to cover each suspect's hair and clothing so that he could focus on their faces. Heasley ultimately identified defendant and Ashley as his attackers. Heasley denied that defendant and Ashley appeared to be the only transgender suspects in the photo array.

¶ 21    Officer Nyvea Rosado testified that she responded to the robbery on October 8, 2011. She interviewed Heasley at the crime scene, and Heasley told her that he was attacked by a group of "black men and women," some of whom appeared to be "trans." Heasley told Rosado that his assailants first sprayed him with mace, which left his eyes swollen and teary, and then beat Heasley before taking his two cellular telephones.

¶ 22    The State rested after Rosado's testimony, and the trial court denied the defense's motion for a directed finding. Defendant exercised her right not to testify or present evidence, and the trial court entered a finding of guilty, stating that "[a]ll counts will merge for the purpose of sentencing." Defendant was held in custody until sentencing. In the trial order, the trial court indicated that defendant was found guilty of "all" counts in the petition.

¶ 23                                IV. Sentencing

¶ 24    On March 23, 2012, probation officer Korte prepared a supplemental PSI, which states that "[defendant] is scheduled to transition to a lesser-restrictive program within the next month or so" and "has been matched with three possible placements," which are: (1) Rosenberg Home in West Rogers Park; (2) Larkin Home in Elgin; and (3) Jarvis Home, the location of which was not specified. The supplemental PSI notes that there have been no recent issues or incident reports involving defendant, and that defendant has been compliant with her treatment, counseling, and taking prescribed medications. Korte noted that, since defendant was placed on probation, she was making a concerted effort to arrive at school on time.

¶ 25    Korte also notes that, although defendant did not testify at trial, she claims that she does not recognize Heasley and that she does not recall ever using pepper spray. Although defendant has a lengthy history of going AWOL, she has not done so since she was taken off electronic monitoring prior to trial. Defendant told the probation officer that she has a better understanding of what it means to be a victim and that she does not intend to harm anyone in the future. Defendant also indicated that she intends to obey the conditions of her probation and that she does not want to spend any more time in custody.

¶ 26    Korte concludes the supplemental PSI with a recommendation that defendant be placed on the mandatory term of five years of probation, which is the mandatory minimum term for a forcible felony committed by a juvenile. Korte also recommends defendant be ordered to complete 50 hours of community service and attend a victim impact panel and community impact panel program.

¶ 27    At the sentencing hearing on March 27, 2012, defendant exercised her right not to present any witnesses, and she did not make a statement in allocution. After considering factors in aggravation and mitigation, the trial court made findings of best interest and wardship and sentenced defendant to 5 years of probation with conditions of 40 hours community service, mandatory school, attend a violence prevention program and community impact panel, obey DCFS and Lawrence Hall rules, and complete any required counseling. The probation order required defendant to reside in the home where she was placed by DCFS and to obey "all reasonable rules and regulations of such residence," and that defendant shall not "leave such

residence overnight for any purpose" without "express permission." The trial court advised defendant that she would be placed in custody, "probably *** for years," if she violates her probation. The trial court then terminated probation on defendant's October 9, 2011, robbery conviction, and defendant was returned to Lawrence Hall. The case was set for a June 19, 2012, progress report.

¶ 28 On June 19, 2012, Korte informed that trial court that defendant was hospitalized at a psychiatric hospital for a week because she attempted to overdose on her medications. Korte also noted that there was some "drama" in defendant's family, but that she has been doing well since then, including attending summer school and cooperating with her therapist. Korte also stated that defendant was set to go to Rosenberg Home for girls as their first transgender client and that they were waiting for a room to become available. The trial court continued the case for an August 14, 2012, progress report.

¶ 29 V. First Petition for Supplemental Relief

¶ 30 The State filed a petition for supplemental relief on July 10, 2012, which alleged in count I that defendant left Lawrence Hall without permission on July 3, 5, 6, and 8; and alleged in count II that defendant: (1) refused to take her medication on July 7 and 8; (2) destroyed property on July 5 and 6; and (3) became aggressive with staff on July 3. At the July 17, 2012, hearing on the State's petition, the trial court asked defendant what happened, and she explained that she was going through issues with her family. Defendant's probation officer advised the court that defendant is on a waiting list to be placed in the Rosenberg Home, which is an all-girls facility. The probation officer explained that defendant already toured the home and had a transition meeting with a counselor there, and that defendant liked the girls that she met at the home. The trial court stated that it would "take this as a bad week" and not place defendant in custody since she had been doing well before the first week of July 2012. Although the trial court declined to arraign defendant on the charges at that time, it placed the State's petition in the court file and expressed hope that defendant would recommit herself to probation so that petition would later be withdrawn. The case was then continued for a September 11, 2012, progress report.

¶ 31 The State did not withdraw the petition and defendant was arraigned on September 11, 2012. The trial court stated that it "hop[ed] that things would get better. It seems like they're not." Probation officer Korte advised the trial court that they did not have a definite date for defendant's placement change, but that they would have a better idea by September 27, 2012. Korte explained that, while most girls at Rosenberg Home live with a roommate, defendant requires a private room for herself, which means that she is waiting for two girls to leave the home for a room to become available. Defendant was then returned to Lawrence Hall on electronic monitoring pending the hearing for defendant's violation of probation. The trial court advised defendant that it would place her in custody for 30 days if she violated the electronic monitoring order, and it set the case for status on October 9, 2012.

¶ 32 Defendant subsequently removed the electronic monitoring bracelet on September 17, 2012, and left Lawrence Hall without permission, and the trial court issued a warrant for her arrest. The warrant was executed the next day, and defendant was brought before the trial court. During the proceeding, the trial court asked parole officer Korte about the timeframe for defendant's placement in Rosenberg Home, and Korte stated, "She may be blowing that. I mean, they already had concerns about the AWOL and, of course, there's the pending thing. I mean, [defendant's] on five years' probation, hasn't even made it through a year yet." The

trial court asked defendant if she had been taking all of her medications and defendant answered yes. The case was continued until September 25, 2012, and the trial court ordered that defendant be held in custody until then.

¶ 33    On September 25, 2012, defendant pled guilty to count I of the supplemental petition for violating her probation when she left Lawrence Hall on numerous occasions in July 2012. At the hearing, defendant's probation officer told the trial court that, at that time, Rosenberg Home was most likely "off the table *** not because of [defendant] per se," but because the Rosenberg Home resident "whose room [defendant] was going to be taking" was no longer planning to leave, which meant that there was no vacancy for defendant to fill for the foreseeable future. However, Korte noted that "there are two other homes through Rosenberg" that might provide a placement for defendant, and if not, then other placement options will be considered. The trial court sentenced defendant to time served, which was eight days, and defendant was released back to Lawrence Hall on electronic monitoring. The case was then continued for an October 23, 2012, progress report.

¶ 34                        VI. Second and Third Petitions for Supplemental Relief

¶ 35    The State filed a second petition for supplemental relief on October 23, 2012, alleging that defendant failed to charge her electronic monitoring bracelet on six occasions between October 12, 2012, and October 17, 2012, and that she also removed her bracelet and went AWOL twice during that time. Korte informed the trial court that defendant stated that she left Lawrence Hall without permission on one occasion because her father had been hospitalized, and she left on another occasion because one of her close friends went missing and she "needed to address that issue." Korte also stated that, at that time, there were no pending placements for defendant and that she had no pending interviews. Defendant was held in custody until she was arraigned on the second supplemental petition the next day, and defendant remained in custody until she pled guilty to her second probation violation on November 6, 2012. The trial court then released defendant back to Lawrence Hall and continued her case for sentencing on December 11, 2012. The trial court decided not to place any additional restrictions on defendant because it wanted to observe how she did without them, but the trial court warned defendant that it would consider a jail sentence if she were to go AWOL again.

¶ 36    Prior to sentencing, Korte prepared another supplemental PSI, which was filed on November 6, 2012. The PSI stated that defendant has resided in the Randell Unit at Lawrence Hall since August 2012, pending her transition to Aggregate Foster Care, which is a group home setting with supervision of staff acting as foster parents rather than having a different staff around the clock. The original plan was to transition defendant to Rosenberg Home for girls, but that plan "fell through at the end of September [2012] when it was determined that there would not be an opening in the near future." Defendant was then matched for an Aggregate Foster Care placement, and the intake coordinator was in the process of arranging a meeting with defendant to discuss their program, although no admission date had been set yet. Korte noted that defendant was ready to move on to a new facility, and that defendant's therapist, whom she had a very strong attachment to, left in October 2012. Also defendant's boyfriend recently convinced others to physically harm defendant on two occasions, one of which took place at Lawrence Hall.

¶ 37    Korte also stated that, since defendant was placed on probation in March 2012, she has only been brought to court for "technical violations." Korte noted that there were no recent

issues with defendant other than arriving at school on time, and defendant was regularly meeting with her new social worker. The probation officer stated that Lawrence Hall "was no longer an appropriate placement" for defendant, and she hoped that defendant would receive a new DCFS placement quickly because defendant would "do much better in a new placement." Korte stated that a commitment to DJJ was not warranted at that time and recommended defendant be sentenced to time served and "given another chance at probation."

¶ 38    On November 20, 2012, the State filed a third petition for supplemental relief, claiming that defendant left Lawrence Hall without permission on eight separate occasions from November 8 through November 19, 2012. The trial court issued a warrant for defendant's arrest on November 29, 2012. Defendant was arrested and brought before the trial court the next day, and the trial court advised her that it would not hold a hearing on the third petition for supplemental relief since she had not been sentenced yet on the second petition, which was set for December 11, 2012. The trial court ordered defendant held in custody until her sentencing hearing on the second petition for supplemental relief.

¶ 39    Prior to sentencing on the State's second petition, another PSI was filed on November 30, 2012. The PSI stated that defendant went AWOL 11 times in November 2012, and that she also skipped school on 5 occasions. Korte stated that, although defendant's behavior is not criminal in nature, she is "concerned" about whether defendant engages in dangerous behavior when she goes AWOL. Korte noted that she warned defendant several times that she would be sentenced to jail if she violated her probation, but defendant did not seem to care about the potential consequences and was not making herself available to receive services, such as medication. Korte concluded that she "cannot offer any other recommendation at this time other than a commitment to DJJ."

¶ 40    The sentencing hearing for the State's second petition for supplemental relief was held on December 11, 2012. At the hearing, defense counsel argued that defendant's problems were the product of improper placement more than anything else, and that defendant was rejected by the last organization that interviewed her. Defense counsel argued that, given defendant's special needs and concerns, the DCFS "failed [defendant] miserably in finding her an appropriate placement," and that it would be unjust for defendant to go to prison for leaving Lawrence Hall since "everybody" acknowledges that Lawrence Hall is not the most appropriate place for her. Defense counsel also requested that, if the trial court committed defendant to the DJJ, then defendant should be brought back to the trial court for a 90-day progress report. The State did not object to defense counsel's argument and offered no argument at the sentencing hearing. Prior to imposing a sentence, the trial court stated the following:

"The one thing that I do want to say about, and I'm–as you know, not a fan of the–what's happening in terms of the Lawrence Hall population. At [*sic*] difficult that population is to put that population in an urban environment makes it even more difficult for anybody to succeed.

[Defendant] did have an opportunity to go to a great placement where they would address her transgender issues. They would be supportive of her. It was in a girl's residential home, and you perhaps were not here at that time, [defense counsel], when that opportunity was given to her.

All right. It was very advance [*sic*] for DCFS to recognize [defendant's] identity, and to put her in the place where she could assert herself as a female. It was because

of her activities that she short-circuited that placement. So as much as I'm not a fan of certain aspects of her past placements, I do know she was given the opportunity if she could conform her being here to move to a safe, appropriate, and nurturing environment, and it's with great sadness that I've reached this point with you, great sadness.

This is violation number three [*sic*]. The problem is not just leaving Lawrence Hall. The problem is high risk behavior on the street, choosing to be a street-oriented person rather than a mature adult on your way to independence.

We're going to continue to try to help you. DCFS will continue to try to work with you to find the right place, but there has to be a consequence. I have given you chance, after chance and, ultimately, chances do run out.

So with a sense of sadness, as I've said, [defendant], there will be a finding of best interest on the violation. The minor shall be sentenced to the Department of Corrections for her protection and the protection of the public."

The trial court then revoked defendant's probation and committed her to the DJJ. The trial court determined that the average guidelines determined that a term of imprisonment for armed robbery is 18 to 20 months, of which defendant received 66 days' credit.

¶ 41    In the commitment order, the trial court indicated that the committing offense was a Class X armed robbery. The trial court checked the box indicating that defendant's legal guardian or custodian is "unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline" defendant "and the best interests of [defendant] and the public will not be served by placement." The trial court checked another box on the commitment order that states that commitment to the DJJ is "necessary to ensure the protection of the public from the consequences of the criminal activity of [defendant]," based on the individualized factors of: (1) defendant's criminal background; (2) review and results of any assessments; and (3) the physical, mental, and emotion health of defendant. However, the trial court did not check the box that states, "reasonable efforts were made to locate less restrictive alternatives to secure confinement and were unsuccessful."

¶ 42    This appeal follows.

¶ 43                              ANALYSIS

¶ 44    On this appeal, defendant first raises a constitutional claim, arguing that the minimum mandatory sentence of five years' probation violates the equal protection clause of the United States and Illinois Constitutions, and as a result, we should vacate defendant's order of commitment to the DJJ, as well as her original five-year probation sentence, and remand this case for resentencing. Defendant next directly appeals her commitment to the DJJ, arguing that the trial court erred as a matter of law, or alternatively abused its discretion, when it revoked her probation and committed her to the DJJ without considering a less-restrictive alternative to a secure confinement sentence as required by the Juvenile Court Act. 705 ILCS 405/5-750(1)(b) (West 2012). Finally, defendant argues that her convictions of aggravated robbery, robbery, theft from person, and battery should be vacated since those surplus convictions violate the one-act, one-crime doctrine.

¶ 45    In response, the State argues that we do not have jurisdiction to consider defendant's claim since she did not appeal her sentence of probation within 30 days. The State also claims that the trial court did not err because it was not required to make a written finding,

and that the appellate record shows that the trial court considered less-restrictive alternatives prior to committing defendant. The State further argues that defendant forfeited her claim concerning convictions because she did not object at trial.

¶ 46        For the following reasons, we remand for resentencing.

¶ 47                                I. Equal Protection Claim

¶ 48        Defendant first raises a constitutional claim, arguing that the Juvenile Court Act's minimum mandatory sentence of five years' probation violates the equal protection clause of the United States and Illinois Constitutions, and as a result, we should vacate defendant's order of commitment to the DJJ, as well as her original five-year probation sentence, and remand this case for resentencing.

¶ 49        However, we do not have jurisdiction to consider defendant's constitutional claim since defendant did not appeal the probation order within 30 days pursuant to Illinois Supreme Court Rule 606(b) (eff. Jan. 1, 2013) ("[T]he notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion."). The timely filing of a notice of appeal is both jurisdictional and mandatory. *In re J.T.*, 221 Ill. 2d 338, 346 (2006); *People v. Smith*, 228 Ill. 2d 95, 104 (2008). In this case, the probation order was entered on March 27, 2012, and defendant filed a notice of appeal on January 10, 2013, more than nine months later. As a result, we lack jurisdiction to consider defendant's challenge to the Juvenile Court Act. See *People v. Fitzgerald*, 25 Ill. App. 3d 973, 975 (1975) ("[W]here there has been no appeal from a judgment of conviction and order of probation, such cannot be reviewed on appeal from an order revoking probation ***.").

¶ 50        Defendant argues that we have jurisdiction to review her constitutional claim because the probation order was void, which is an issue that may be raised at any time. *People v. Bryant*, 128 Ill. 2d 448, 453-54 (1989); *People v. Thompson*, 209 Ill. 2d 19, 28 (2004) ("[A] void order may be attacked at any time or in any court, either directly or collaterally."). However, "a judgment is void if and only if the court that entered it lacked jurisdiction." *People v. Hubbard*, 2012 IL App (2d) 101158, ¶ 16. See *People v. Davis*, 156 Ill. 2d 149, 155 (1993) ("Where jurisdiction is lacking, any resulting judgment rendered is void and may be attacked either directly or indirectly at any time."). Even if defendant is correct that the Juvenile Court Act violates the equal protection clause of the United States and Illinois Constitutions, the probation order would be merely voidable, not void, since the order was entered by a court of competent jurisdiction. *Davis*, 156 Ill. 2d at 155-56 ("[A] voidable judgment is one entered erroneously by a court having jurisdiction and is not subject to collateral attack."). As a result, we do not consider defendant's constitutional claim since we do not have jurisdiction to review the probation order.

¶ 51                        II. Lack of a Least-Restrictive-Alternative Finding

¶ 52        Defendant next directly appeals the commitment order, arguing that the trial court erred as a matter of law, or alternatively abused its discretion, when it revoked her probation and committed her to the DJJ without considering a less-restrictive alternative to a secure confinement sentence as required by the Juvenile Court Act. 705 ILCS 405/5-750(1)(b) (West 2012). The State argues that the trial court did not err because it was not required to

make a written finding, and that the appellate record shows that the trial court considered less-restrictive alternatives.

¶ 53    Whether the Juvenile Court Act requires the trial court to make a finding is a matter of statutory construction that we review *de novo*. *Fisher v. Waldrop*, 221 Ill. 2d 102, 112 (2006). As stated, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 54    "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 45 (2002). The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Birkett*, 202 Ill. 2d at 45. When statutory language is clear, it must be given effect without resort to other tools of interpretation. *Fisher*, 221 Ill. 2d at 112. Generally, statutory language is considered ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 288 (2008). Since all provisions of a statutory enactment are viewed as a whole, words and phrases should not be construed in isolation, but should be interpreted in light of other relevant provisions of the statute. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Lieberman*, 201 Ill. 2d at 308. However, "[i]t is a cardinal rule of statutory construction that we cannot rewrite a statute, and depart from its plain language, by reading into it exceptions, limitations or conditions not expressed by the legislature." *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 81 (2009). Furthermore, we always presume that the legislature did not intend to create absurd, inconvenient, or unjust results, and we have a duty to construe a statute in a manner that upholds its validity and constitutionality. *Fisher*, 221 Ill. 2d at 112.

¶ 55    Prior to 2012, the Juvenile Court Act permitted the trial court to commit a juvenile to the Department of Corrections (DOC) provided that it made a finding either that commitment was in the best interests of the minor and public, or that commitment was necessary to protect the public. 705 ILCS 405/5-750(1) (West 2000). The original statute stated:

> "Except as provided in subsection (2) of this Section, when any delinquent has been adjudged a ward of the court under this Act, the court may commit him or her to the Department of Corrections, Juvenile Division, if it finds that (a) his or her parents, guardian or legal custodian are unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-740 or; (b) it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent." 705 ILCS 405/5-750(1) (West 2000).

Although there was no law prior to 2012 requiring the use of less-restrictive alternatives, reviewing courts held that commitment to the DOC should only be used when less-severe alternatives would not be in the best interests of the minor and the public. *In re S.M.*, 229 Ill. App. 3d 764, 769 (1992) (citing *In re G.S.*, 194 Ill. App. 3d 740, 743 (1990), and *In re B.S.*, 192 Ill. App. 3d 886, 891 (1989)). See *In re Darren M.*, 368 Ill. App. 3d 24, 39 (2006) ("[C]ommitment is to be used only when less severe placement alternatives would not be in the best interests of the minor and the public." (Internal quotation marks omitted.)).

¶ 56    On January 1, 2012, an amended section 5-750(1) became effective, which kept the original language of subsection (1)(b) but combined it with subsection (1)(a). 705 ILCS

405/5-750(1)(a) (West 2012). The amendment then added a new subsection (1)(b) that required an additional mandatory finding that commitment to the DJJ be the least-restrictive alternative. 705 ILCS 405/5-750(1)(b) (West 2012). The current statute provides:

> "Except as provided in subsection (2) of this Section, when any delinquent has been adjudged a ward of the court under this Act, the court may commit him or her to the Department of Juvenile Justice, if it finds that (a) his or her parents, guardian or legal custodian are unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-740 or it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent; and (b) commitment to the Department of Juvenile Justice is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement." 705 ILCS 405/5-750(1) (West 2012).

¶ 57    The plain language of the statute states that the trial court may commit defendant to the DJJ only if it finds that commitment to the DJJ is the least-restrictive alternative. *In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 45 (citing 705 ILCS 405/5-750(1)(b) (West 2012)). In other words, the trial court has discretion to commit defendant to the DJJ, but it may only do so if it first makes a finding that there are no less-restrictive alternatives to secure confinement available to defendant. *In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 50 ("Prior to committing a juvenile to the DOJJ, a trial court must have before it evidence of efforts made to locate less restrictive alternatives to secure confinement and the court must state the reasons why said efforts were unsuccessful.").

¶ 58    In the case at bar, defendant was committed to the DJJ on December 11, 2012, so she was subject to the amended statute, which requires that the trial court finds that there are no less-restrictive alternatives to secure confinement. However, the trial court never made a finding that defendant's commitment to the DJJ was the least-restrictive alternative, and it never expressly stated during court proceedings that commitment was the least-restrictive alternative or that it had made that finding. Moreover, the trial court did not check the box on the commitment order indicating that commitment was the least-restrictive alternative. As a result, the trial court never made the finding required under the recently amended section 5-750(1). 705 ILCS 405/5-750(1)(b) (West 2012).

¶ 59    The State claims the statute does not require the trial court to make a written finding or to check a box on a form order indicating that it made a finding. In support, the State cites *In re J.C.*, 163 Ill. App. 3d at 888, which held that "[a] judge need not enumerate all possible alternatives when making a disposition [citation], and the remarks of the trial judge can illustrate consideration of alternatives." The State claims that, although the trial court never expressly stated as such, the appellate record shows that the trial court considered less-restrictive alternatives prior to committing defendant. The trial court continually requested updates concerning defendant's placement in a different home. Defendant was set to be the first transgender resident at Rosenberg Home for girls, and she toured the home and met many of the staff and residents there. Defendant's probation officer then told the trial court that defendant "may be blowing" the placement due to her behavior, but later explained that an outgoing resident did not leave after all, which left no vacancies for defendant to fill. The State claims that since the trial court was presented with this evidence and it considered

alternatives to secure confinement, we can infer from the appellate record that the trial court found that commitment was the least-restrictive alternative.

¶ 60    However, although the appellate record may support a determination that there were no less-restrictive alternatives available to defendant, the plain language of section 5-750(1)(b) states that the trial must find that commitment is the least-restrictive alternative. 705 ILCS 405/5-750(1)(b) (West 2012). *In re J.C.* is distinguishable because it was decided before the statute was amended in 2012. *In re J.C.*, 163 Ill. App. 3d 877. In that case, the appellate court found that the trial court need not enumerate every possible alternative to secure confinement to show that is considered alternatives. While the *In re J.C.* court was concerned with the issue of the trial court's *consideration* of lesser alternatives, the issue on appeal in the instant case is whether the trial court made a *finding* as required under the recently amended statute. 705 ILCS 405/5-750(1)(b) (West 2012). Here, the trial court never expressly stated during the proceedings that it made this finding, and it also did not check the box on the commitment order indicating that it made the finding. Although the trial court may have considered the issue of less-restrictive alternatives prior to committing defendant to the DJJ, it did not make a finding required under section 5-750(1)(b). 705 ILCS 405/5-750(1)(b) (West 2012).

¶ 61    The State also points to *People v. Davis*, 93 Ill. 2d 155, 162-63 (1982), where our supreme court held that certain sections of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, ¶¶ 1005-4-1, 1005-8-1) may not require the trial court to state on the record reasons for imposing a particular sentence. However, *Davis* is distinguishable because in that case, the issue was whether the trial court was required to state every reason for its pronouncement of a sentence. Here, the trial court is only required to make a finding, and section 5-750(1)(b) does not require that it state every reason that it made the finding. 705 ILCS 405/5-750(1)(b) (West 2012).

¶ 62    We are concerned with the precedential value of this opinion if we were to determine that the trial court made the statutorily required finding based solely on its statement that it considered the issue. Such a holding would call into question whether express findings are even necessary, which would be in direct conflict with the purpose of adding the new requirement to the statute. Since the trial court did not find that commitment to the DJJ was the least-restrictive alternative, we remand the case to the trial court for resentencing in accordance with the provisions of section 5-750(1)(b). 705 ILCS 405/5-750(1)(b) (West 2012).

¶ 63                              III. One-Act, One-Crime Doctrine

¶ 64    Finally, defendant argues that the trial court violated the one-act, one-crime doctrine when it indicated in the trial order that it found defendant guilty of "all" counts on the petition: armed robbery, aggravated robbery, robbery, theft from person, aggravated battery, and battery. As a result, defendant requests that we vacate her surplus convictions and modify the trial order to reflect only two convictions: armed robbery and aggravated battery. The State responds that defendant forfeited this issue because she did not object at trial.

¶ 65    However, we do not have jurisdiction to consider defendant's claim since she did not appeal her conviction within the statutory 30-day time period. As stated, a notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within

30 days after the entry of the order disposing of the motion. Ill. S. Ct. R. 606(b) (eff. Jan. 1, 2013). Here, defendant was convicted on March 21, 2012, and sentenced March 27, 2012. Defendant did not file a notice of appeal until over nine months later, on January 10, 2013, after she pled guilty to a second violation of her probation. As a result, we lack jurisdiction to consider defendant's challenge to the Juvenile Court Act.

¶ 66    We note that, even if we were to consider this issue, the trial court did not err because it entered a single adjudication of delinquency and merged all the counts into one crime. See *In re Samantha V.*, 234 Ill. 2d 359, 378 (2009) (finding that the trial court violated the one-act, one-crime doctrine when it found defendant guilty of both counts *and failed to merge the counts* or otherwise indicate on the record that defendant's adjudication of delinquency was based on only one count of aggravated battery). At the conclusion of defendant's trial, the trial court stated, "[T]here will be a finding of guilty. All counts will merge for purposes of sentencing." The trial court then entered a sentence of five years of probation, and it later indicated in the commitment order that the committing charge was the sole offense of armed robbery. As a result, there was no error because the trial court made only one finding of guilty and merged all counts into a single adjudication of delinquency.

¶ 67                                                CONCLUSION

¶ 68    For the foregoing reasons, we remand the case for resentencing. We do not have jurisdiction to review defendant's original conviction and probation sentence since defendant did not appeal the probation order within 30 days and the order was not void. However, the trial court did not make a finding that committing defendant to the DJJ was the least-restrictive alternative as required by the Act, and as a result, we remand this case for resentencing on the State's second petition for supplemental relief.

¶ 69    Remanded with instructions.

- 15 -